# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARLEEN PORTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **No. 06-cv-1145** |
| | ) | |
| **INTERMEDIATE UNIT I, LAWRENCE** | ) | |
| **J. O'SHEA, Ph.D., SUE R. CONRADY** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION

### I. INTRODUCTION

Plaintiff Marleen Porter ("Plaintiff") brought this civil rights action against Defendants Intermediate Unit I School District ("School District"), Lawrence J. O'Shea ("O'Shea") and Sue R. Conrady ("Conrady"), as supervisory employees of the School District, for alleged discriminatory and retaliatory actions taken against the Plaintiff in her job as a teacher for Defendant School District. Specifically, Plaintiff brings the following claims: (1) a First Amendment retaliation claim; and (2) a claim for violation of her equal protection rights under the Fourteenth Amendment.

Pending before this Court is Defendants' supplemental motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). The Defendants contend that the Plaintiff's First and Fourteenth Amendment constitutional claims under 42 U.S.C. § 1983[1] are barred by the appropriate statute of limitations,

---

[1] 42 U.S.C.§ 1983 does not create federal court jurisdiction, rather it creates a cause of action against those who, acting pursuant to state government authority, violate the Constitution or laws of the United States. *Howlett By and Through Howlett v. Rose*, 496 U.S. 356, 356 (1990).

and that those same claims fail to state a claim upon which relief can be granted and should therefore be dismissed.

## II. LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the Court accepts all well-pleaded allegations as true and views them in the light most favorable to the plaintiff. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1420 (3d Cir.1997). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, (1974)). Claims should be dismissed under Rule 12(b)(6) "only if it is certain that no relief can be granted under any set of facts which could be proved." *Klein v. Gen. Nutrition Cos.,* 186 F.3d 338, 342 (3d Cir.1999) (internal citation omitted). However, a court will not accept bald assertions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *See In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 215 (3d Cir.2002); *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 n. 8 (3d Cir.1997).

## III. FACTUAL BACKGROUND

In view of the appropriate legal standard, this Court accepts as true all of the Plaintiff's well-pleaded facts. Plaintiff was employed by School District as a full-time, tenured employee since August 1979. Amend. Compl., Docket No. 19, at ¶ 6. Plaintiff was assigned to the Uniontown Adult Learning Center ("UALC"). *Id.* at ¶ 19. In the spring of 1995, Defendant Conrady was hired by the School District and became Plaintiff's supervisor. *Id.* at ¶ 8. At the time of Conrady's hiring, a student nominated by the Plaintiff had been given the "Adult Learner of the Year Award" by the Pennsylvania Department of Education. *Id.* at ¶ 9. Conrady attempted to take credit for this

2

student's achievement. *Id.* at ¶ 10-11. When Plaintiff resisted these attempts and advised others of what was going on, Conrady began a course of irrational and arbitrary treatment of the Plaintiff which has lasted over nine years and has created a hostile work environment for the Plaintiff. *Id.* at ¶ 11-12.

At first, Defendant Conrady expanded Plaintiff's workload, and when Plaintiff sought relief from the excessive work through her union representative, Plaintiff was subjected to random visits from Conrady and to repeated accusations of student complaints about her teaching. *Id.* at ¶ 13-14. After being told that she was going to be sent to Laurel Business Institute ("LBI") "in order to justify [her] job," the Plaintiff filed a formal grievance with her union in September of 1997. *Id.* at ¶ 16. Conrady responded to this grievance by beginning a series of almost annual involuntary transfers of the Plaintiff. *Id.* at ¶ 19.

Instead of being permanently assigned to the UALC, Plaintiff was transferred to LBI in August of 1998. *Id.* at ¶ 20. While assigned to LBI, Plaintiff was repeatedly observed by the employees of the private, for-profit business school, and was asked to try and influence students studying for the GED to consider further studies at LBI. *Id.* at ¶ 21. Plaintiff considered this influence unethical, and once again filed a grievance with her union. Conrady's response, after initially threatening Plaintiff with a transfer to the unwanted assignment of Brierwood Acres ("BA"),[2] was to involuntarily transfer her to a travel between UALC, Fayette Career Link ("FCL"), and Waynesburg Adult Learning Center ("WALC"). *Id.* at ¶ 21-25. The thirty (30) miles travel to

---

[2] "Brierwood was known to be a crime-ridden, drug activity infested, dilapidated public housing project. It was on the verge of closing, and a portion of it was closed after Conrady advised [Plaintiff] she would be sent there. *Id.* at ¶ 24.

Waynesburg was outside of the Plaintiff's contractually bargained limits for travel and was unnecessary since WALC was short on students and already had a full-time teacher. *Id.* at ¶ 25-27. As a result of this assignment, Plaintiff filed another grievance, and after being awarded travel-expenses for the trips to Waynesburg by the arbitrator, Plaintiff was assigned back to UALC. While at UALC, Plaintiff became aware of potentially illegal and criminal conduct by a School District employee. This conduct involved a school counselor providing counseling services to adult students on School District's time, and, in addition, billing the Pennsylvania Department of Welfare for providing the services to the students as well. *Id.* at ¶ 30. Plaintiff reported this conduct to State Representative Larry Roberts. *Id.*

In the 2002-2003 school year, the "Head Teacher" become incapacitated and Plaintiff was told by Conrady that even though she was the most senior, full-time teacher, she would "never be promoted to 'Head Teacher'." *Id.* at ¶ 35. Instead, Conrady attempted to force Plaintiff to do the duties of the "Head Teacher" on an interim basis without the title and extra compensation. *Id.* at ¶ 36. After filing another grievance as a result of this treatment, Plaintiff was assigned by Conrady to travel to three different school districts, including one that was outside the permissible mileage limit. *Id.* at ¶ 38. At one of the assigned schools, Plaintiff observed nonunion staff performing the work that was slated to be performed by permanent tenured employees. *Id.* at ¶ 39-40. Plaintiff filed a final grievance on that matter, and, although the grievance was pursued to arbitration, the grievance was eventually settled. *Id.* at ¶ 40-41. As a result of that grievance, however, the School District was instructed to transfer Plaintiff to "an assignment consistent with her contractual rights." *Id.* at ¶ 41.

4

In alleged retaliation for this last grievance, Plaintiff was deliberately assigned to a position at the Alternative Education Center ("AEC").[3] *Id.* at ¶ 42. Plaintiff lacked the proper training and required certification for this position teaching special education. *Id.* at ¶ 43. Plaintiff was notified of this final transfer on August 31, 2004. *Id.* at ¶ 45. Although she tried to perform the work at AEC, she was unable to cope with the behavioral problems of the students. *Id.* at ¶ 46. After repeated observations of her teaching by the School District, Plaintiff felt like she was being set up for an unsatisfactory rating. *Id.* In October 2004, Plaintiff suffered a mental collapse and has been unable to work since that time. *Id.* at ¶ 48.

## IV. ANALYSIS

### A. <u>Statute of Limitations</u>

In its Supplemental Motion to Dismiss, Defendants argue that all of the Plaintiff's claims are time-barred. It is well settled law that the appropriate statute of limitations for a 42 U.S.C. § 1983 action is the forum state's statute of limitations for a tortious personal injury action. *Wilson v. Garcia*, 471 U.S. 261, 276 (1985). In Pennsylvania, the appropriate limitation period for a § 1983 action is the two-year limitation provided by 42 Pa. C.S.A.§ 5524, which governs both an action to recover damages for injuries to the person caused by a wrongful act, neglect, unlawful violence, negligence of another, and any other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct. *Smith v. City of Pittsburgh*, 764 F.2d 188, 194 (3d Cir. 1985). Although the actual statute of limitations in a §

---

[3] Plaintiff describes the AEC as an extremely undesirable assignment akin to being sent to the "Gulag." Docket No. 19, at ¶ 43. "The alternative school is typically filled by teachers with little or no seniority or with teachers whom the IU wishes to force out of the system." *Id.*

1983 action is determined by state law, federal law determines the charging period or accrual date for when that statute of limitations period begins to run. *Baron v. Allied Artists Picture Corp.*, 717 F.2d 105, 108 (3d Cir. 1983) (citations omitted).

In determining the accrual date for the statute of limitations, the Supreme Court has indicated the importance of focusing on the specific employment practice or act that is at issue. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110-111 (2002). The employment practice or action is "a discrete act or single 'occurrence'" that takes place at a particular point in time. *Id.* The charging period or accrual period for that discrete act or occurrence does not always begin when the act or occurrence takes place, but when that action is actually communicated to the Plaintiff. *Delaware State College v. Ricks*, 449 U.S. 249, 258-259 (1980).   Additionally, each new intentionally discriminatory act or occurrence begins a new charging period. *Morgan*, 536 U.S. at 113. In the recently decided case of *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 127 S. Ct. 2162 (2007), however, the Supreme Court emphasized that "[a] new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination." 127 S. Ct. at 2169.

Plaintiff contends that Defendants discriminated against her in retaliation for her repeated grievances with her Union. Defendants' alleged retaliation included transferring Plaintiff to AEC, an assignment for which she was not trained nor certified to hold. This transfer was communicated to the Plaintiff by a letter dated August 31, 2004. Plaintiff filed this action on August 28, 2006, just shy of two years from the date that particular discriminatory action was communicated to the Plaintiff.

Defendants, however, argue that all of the Plaintiff's claims are time-barred. According to

6

the Defendants, Plaintiff had actual knowledge of her transfer in May or June 2004, thereby causing

the two-year statute-of-limitations to expire in May or June of 2006. *See* Docket No. 23, at 3.

Therefore, Defendants argue that since none of the adverse employment actions or occurrences

happened inside of the two year limitations period, Plaintiff's entire action is time-barred. In the

alternative, Defendants argue that even if this last act, i.e., the letter communicating Plaintiff's

transfer, is within the two year statute of limitations, only that particular action can be redressed

because all of the other actions fall outside of the permissible time period. For the reasons that

follow, this Court cannot agree with the first of Defendants' arguments, that all of the acts are barred,

but does agree with their alternative argument, that the Plaintiff cannot use the continuing violation

theory for actions that occurred outside of the statute of limitations.

Considering the allegations in the complaint in a light most favorable to the Plaintiff, the

Court must find as true the Plaintiff's assertion that she learned of her final discriminatory transfer

on August 31, 2004, and therefore, that notification of the final transfer is the discrete act or

occurrence that triggers the charging period. *Delaware State College,* 449 U.S. at 258. Since

Plaintiff filed the action at hand on August 28, 2004, Plaintiff's claim based on the transfer is

properly brought within the two year statute of limitations period for a § 1983 action and is not time-

barred. For the reasons set forth below, however this Court does find that the other alleged adverse

employment actions taken against the Plaintiff are time-barred even under the "continuing violation"

theory.[4]

---

[4] Defendants argue that *Ledbetter v. Goodyear Tire & Rubber Co., Inc.* "has put to rest this continuing violation
theory." Notice Advising the Court of Changes to Case Law, Docket No. 23, at 4. This Court cannot agree.
Defendants argue that *Ledbetter* stands for the proposition that a "plaintiff cannot use alleged prior discriminatory
acts, upon which no action was taken, to file a subsequent action."*Id* at 5. *Ledbetter* clearly states, however, that
"[a] new violation does not occur, and a new charging period does not commence, upon the occurrence of
subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination." 127 S. Ct. at

The continuing violation theory is an "equitable exception to the timely filing requirement."

*West v. Philadelphia Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995). Although the continuing violations

theory has most often been applied in Title VII employment discrimination actions, *see, e.g.*, *Bronze*

*Shields, Inc., v. New Jersey Dept. of Civil Serv.*, 667 F.2d 1074, 1081 (3d Cir.1981); *Jewett v. Int'l*

*Tel. and Tel. Corp.*, 653 F.2d 89, 91 (3d Cir.1981), there is nothing that precludes the use of the

theory in other contexts or actions. *See Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001)

(applying the doctrine to a substantive due process claim brought under § 1983); *Brenner v. Local*

*514, United Bhd. Of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir. 1991) (applying the

doctrine to a claim brought under the National Labor Relations Act); *Centifanti v. Nix*, 865 F.2d

1422, 1432-33 (3d Cir.1989) (applying the doctrine to a procedural due process claim brought under

§ 1983).

The continuing violation theory allows claims for discriminatory conduct that began prior

to the charging period to survive if it can be shown by the Plaintiff that the acts complained of are

part of an ongoing practice or pattern of discrimination.[5] *Local 514, United Bhd. Of Carpenters &*

---

2169. The Supreme Court is making a distinction between continuing but non-discriminatory "adverse effects" of a past discriminatory act, and an actual and intentional subsequent discriminatory act. Subsequent intentionally discriminatory acts or series of acts are considered "fresh violations" and thus begin anew the charging period.*Id.* In *Ledbetter*, the Plaintiff made "no claim that intentionally discriminatory conduct occurred during the charging period or that discriminatory decisions that occurred prior to that period were not communicated to her."*Id.* Those facts are distinguishable from the instant case where the Plaintiff has clearly alleged intentionally discriminatory conduct within the charging period. Moreover, as a further distinction between the cases, the*Ledbetter* decision pertained to a Title VII claim, whereas the instant case involves a § 1983 claim. Thus, the attempted use of the continuing violations theory is appropriate in these circumstances.

This Court also notes that on July 31, 2007, the House of Representatives passed a bill by a 225-199 vote, which, if it were to become law, would overturn the Court's decision in*Ledbetter* with regards to pay discrimination cases.

[5] Plaintiff asserts that the Defendants' actions over a period of nine years created a hostile work environment for the Plaintiff and that such a claim meets the requirements of the continuing violation theory. Docket No. 19, at ¶ 12. Although the Third Circuit has not adopted a per se rule as to whether hostile work environment claims also constitute a continuing violation, the Court has pointed with approval to the fact that sister courts see a correlation

*Joiners of Am.*, 927 F.2d at 1295. In order to use equitable tolling permitted by the "continuing violation" theory, the Plaintiff must show two things: (1) at least one act occurred within the filing period; and (2) the harassment is not the occurrence of "isolated or sporadic acts" of intentional discrimination but a "persistent, on-going pattern." *Philadelphia Elec. Co.*, 45 F.3d at 754-55.

Addressing the first prong of the continuing violations theory, a claim can be made under the theory if at least one of the discriminatory actions occurred within the filing period. *Id.* The "crucial" question for the Court is whether "any present violation exists." *United Airlines, Inc. v. Evans*, 431 U.S. 553, 558 (1977). As stated above, Plaintiff alleges that notification of her final transfer occurred within the applicable filing period. Thus, construing the allegations in a light most favorable to her, as this Court now must, Plaintiff clearly meets the first prong.

In examining the second prong, the Court considers and weighs several factors to determine if a continuing violation has occurred : "(1) subject matter - whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation; (2) frequency - whether the acts are recurring or more in the nature of isolated incidents; and (3) the degree of permanence - whether the act had a degree of permanence which should trigger awareness of and duty to assert his/her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate." *Cowell*, 263 F.3d at 292; *Philadelphia Elec. Co.*, 45 F.3d at 755 (both citing with approval *Berry v. Board of Supervisors of Louisiana State Univ.*, 715 F.2d 971, 981 (5th Cir.1983)). The last factor, "[t]he consideration of the 'degree of permanence' is the most important of the factors." *Cowell*, 263 F.3d at 292.

Since most of the alleged actions taken by the Defendants against the Plaintiff admittedly fall

---

between the two theories. *See Philadelphia Elec. Co.*, 45 F.3d at 755.

outside of the two-year statute of limitations period, this Court must examine the factors identified in *Cowell* to determine if the Plaintiff has alleged acts that are "isolated or intermittent" or whether the acts are part of a persistent, on-going pattern.

First, with regard to the "subject matter" of the alleged violations, the Court notes these acts, with the exception of the increased workload and denial of promotion to the position of Head Teacher, involved "almost annual involuntary transfers" of the Plaintiff to new teaching assignments. Docket No. 19, at ¶ 19. In fact, all of the alleged discriminatory acts, including the increased workload and denial of tenure, among other claims asserted by the Plaintiff, involve alleged harms related to the Plaintiff's teaching assignments. Accordingly, this Court finds that the alleged acts are similar enough to be considered the same "subject matter" or same type of discriminatory action.

Next, the Plaintiff must allege discriminatory actions that occur with enough "frequency" or on-going recurrence so that they could not be considered isolated or sporadic events. Plaintiff alleges intentional acts of discrimination by the Defendants that occurred every year from 1996 through 2004. In both 1996 and 1997, Plaintiff was allegedly subjected to increased scrutiny in the form of repeated observations by her supervisors, and meetings with administration officials over students complaints against her. Docket No. 19, at ¶ 15-16. After teaching exclusively at the Uniontown Adult Learning Center (UALC) from August of 1979 until August of 1998, Plaintiff was involuntarily transferred at the start of the 1998 school year. Docket No. 19, at ¶ 19. Each year from 1998 until 2004, Plaintiff was involuntarily transferred to new teaching assignments allegedly in response to her filing of union grievances.

It is important to note that courts have never set a specific standard for how close together the alleged discriminatory acts must occur to qualify as a continuing violation. *Cowell*, 263 F.3d at

10

295. This Court finds the alleged yearly transfers of the Plaintiff to different teaching assignment are not only substantially similar in "subject matter," but consistent and frequent enough so that they cannot be considered "isolated or intermittent." For this reason, the acts are frequent enough to serve the overall equitable purpose of the continuing violations theory.

Finally, in order to adequately plead the use of the continuing violation theory, it must be determined whether the acts in question had a "degree of permanence" which should trigger the plaintiff's awareness of and duty to assert his/her rights. *Id.* At 292 (citing *Berry,* 715 F.2d at 981). As noted above, this third factor is the most important, and thus the most heavily weighed by the Court in determining whether the Plaintiff is entitled to equitable tolling afforded by the continuing violations theory. *Cowell,* 263 F.3d at 292. This factor is weighed most heavily because "the continuing violations doctrine should not provide a means for relieving plaintiffs from their duty to exercise reasonable diligence in pursuing their claims." *Id.* at 295 (citing with approval *Nat'l Adver. Co. v. City of Raleigh,* 947 F.2d 1158, 1168 (4th Cir.1991) (citations omitted)).

If Plaintiff was aware of the wrongfulness of the acts she alleges, then the Plaintiff would have been put on notice of her duty to declare her rights. See *Cowell,* 263 F.3d at 295 ("[T]he plaintiffs were aware of the wrongfulness of the liens when the liens were imposed in 1992 and 1993. Therefore, the plaintiffs should have brought a claim to strike the liens in state court or filed a § 1983 claim within the applicable limitations periods."). In the instant case, Plaintiff filed grievances with her union on an almost yearly basis from 1997 until 2004 over the involuntary transfers Plaintiff wanted the union to grieve as wrongful conduct of the Defendants. See Docket No. 19, at ¶ 17. Additionally, Plaintiff explicitly alleges that as early as 1997, Defendants had created "a most impossible work environment." *Id.* Plaintiff, in her own words, asserts that the alleged

11

conduct of the Defendants was "irrational and arbitrary," *Id.* at ¶ 18, and that the transfers to other schools "was intended to be punitive and to chill further protected activity." *Id.* at ¶ 27. Plaintiff also alleges that "[f]rom September to February [2001], [she] had zero students and feared further reprisals." *Id.* Further, she contends that Defendant Conrady explicitly advised Plaintiff "that she would never ever be promoted to 'Head Teacher.'" *Id.* at ¶ 35. Plaintiff also pleads that "[a]t the end of the 2002-2003 school year, Mrs. Conrady wrote a letter to Porter which threatened changes to come in the next school year." *Id.* at ¶ 37.

The Court does note that in Count I, the Plaintiff's complaint alleges that "the Defendants clothed their activities with the gloss of legality [to] conceal their underlying purpose to retaliate against [her]." *Id.* at ¶ 51. However, from the face of complaint, it is obvious to this Court that the Plaintiff admits being aware of the wrongfulness of the Defendants' alleged acts as far back as 1997, a full eight years before the filing of this action. Her repeated filing of grievances with her union appear to this court to belie her "gloss of legality" argument and is sufficient to show she had been put on notice to assert her rights.

To allow the Plaintiff to use equitable tolling and the continuing violations theory to reach back to acts that fall outside the statute of limitations period would not only be unfair to the Defendants in this case, but would be contrary to the policy rationale behind the imposition of such statute of limitations. *See United States v. Richardson*, 889 F.2d 37, 40 (3d Cir.1989)(citing *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 352, 103 S.Ct. 2392, 2397, 76 L.Ed.2d 628 (1983)). ("Limitations periods are intended to put defendants on notice of adverse claims and to prevent plaintiffs from sleeping on their rights."). Accordingly, this Court finds that this third factor weighs heavily in favor of denying the Plaintiff the use of equitable tolling under the continuing violations

12

theory.

Balancing all of the factors and equities in this case, this Court concludes that even under the deferential standard of a 12(b)(6) motion, the continuing violations theory is not available to the Plaintiff in asserting her claims that fall outside of the two year statute of limitations period. However, the Plaintiff is entitled to proceed on any claims that derive from actions that occurred after August 28, 2004. More specifically, Plaintiff can proceed on any claim that arises out of her final transfer to the AEC for the 2004-2005 school year to teach children with behavioral problems. Accordingly, the Defendant's Supplemental Motion to Dismiss is granted with respect to all civil rights claims under 42 U.S.C. § 1983 that allegedly occurred prior to Plaintiff's last transfer to the AEC on August 28, 2004, and denied with respect to the claims arising out of the transfer to the AEC on August 28, 2004.

### B. **First Amendment Retaliation Claim**

In order to state a claim for retaliation, the Plaintiff, as a public employee, must allege that: (1) she engaged in a constitutionally-protected activity; (2) that the government responded with retaliation; and (3) the protected activity caused the retaliation. *See Eichenlaub v. Township of Indiana*, 385 F.3d 274, 282 (3d Cir. 2004). Specifically, under Section 1983, public employees, such as the Plaintiff in the instant case, may sue for retaliatory action taken by the employer against the employee for the exercise of her First Amendment rights if: "(1) they speak on a matter of public concern; (2) their interest in the field outweighs the government's concern with effective and efficient fulfillment of its responsibilities to the public; (3) the speech causes the retaliation; and (4) an adverse employment action would not occur but for the speech." *Fogerty v. Boles*, 121 F.3d 886, 888 (3d Cir. 1997) (citing *Green v. Philadelphia Housing Auth.*, 105 F.3d 882, 885 (3d Cir. 1997)).

13

Defendants argue that Plaintiff's First Amendment retaliation claim must be dismissed because she has failed to plead that the Defendants retaliated against her with an adverse employment action because of her speech on a matter of public concern. Docket No. 10, at 6. Defendants argue that (1) Plaintiff made no "allegations of significant change in the Plaintiff's employment status," and (2) Plaintiff's speech dealt with "purely personal concern[s]," or in the case of her reporting fraudulent activity, the speech was made pursuant to her official duties, and thus is not protected under the First Amendment. Docket No. 20, at 6.  For the reasons set forth below, this Court cannot agree with either of the Defendants' arguments.[6]

## 1. Adverse Employment Action

First, in order to state a claim for First Amendment retaliation, a public employee must show that he was subjected to an adverse employment action. "A public employer adversely affects an employee's First Amendment rights when it refuses to rehire an employee because of the exercise of those rights or when it makes decisions, which relate to promotion, transfer, recall and hiring, based on the exercise of an employee's First Amendment rights." *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003) (quoting *Suarez Corp. Industries v. McGraw*, 202 F3d. 676, 686 (4th Cir. 2000)). Adverse employment actions must be "tangible" and constitute a significant change in employment status. *Cardenes v. Massey*, 269 F.3d 251, 265-267, n. 10 (3d Cir. 2001) (citations omitted).  The Third Circuit has specifically held that "a transfer to a job that an employer knows an employee

---

[6] The Defendants do not argue that Plaintiff's First Amendment retaliation claim must be dismissed because she has failed to allege that her interest in publicly speaking outweighs the government's interest or that the speech in question (engagement in protected activity) caused the retaliation.  The Court, therefore, will not address these issues at this time other than to note that Plaintiff will in time have to prove that the protected activity she engaged in caused the retaliation and the adverse employment action would not have occurred but for the protected activity. Additionally, the Plaintiff would have to show that her interest in disclosure outweighed the government's interest in performing and fulfilling its services to the public.

cannot do may constitute adverse employment action." *Dilenno v. Goodwill Industries of Mid-Eastern Pennsylvania,* 162 F.3d 235, 236 (3d Cir. 1998).

Defendants argue that Plaintiff has failed to state a claim because she made "no allegation that she was reassigned to a position with significantly different responsibilities" and that "[a]t most [the transfer] involved additional travel." Docket No. 10, at 7. This argument, however, does not accurately reflect the Plaintiff's allegations in the Complaint. Plaintiff clearly and unambiguously alleges that she was subjected to a final transfer to teach children with behavioral problems for the 2004-2005 school year, a job that entailed significantly different responsibilities and skills. Docket No. 19, at ¶ 42-43. More specifically, Plaintiff alleges "that for the first time in her career, [she] would not be teaching adult education," and that she was "not certified to teach special education students." *Id.* Plaintiff avers that she was subjected to an undesirable and unnecessary transfer that involved significantly differently responsibilities. Moreover, Plaintiff alleges that AEC is typically filled "with teachers whom the IU wishes to force out of the system. *Id.* at ¶ 43. Accordingly, this Court finds that Plaintiff has sufficiently alleged that she was subjected to an adverse employment action.

## 2. **Protected Activity**

Second, Defendants argue that the Plaintiff's speech in question was not speech that involved matters of public concern. Further, they contend that the speech in question was made pursuant to her official duties. In either case, the Defendants argue, her speech is not entitled to protection under the First Amendment. Plaintiff counters that she engaged in protected activity by not only speaking out as a citizen on a matter of public concern (reporting to her state representative about the illegal and fraudulent activities by an employee of Intermediate Unit I), but also when she filed grievances

15

with her local union over some of the actions and activities of her employer.

### a. **Public Concern**

Under the free speech clause of the First Amendment the Defendants are right to argue that the speech in question must be protected, i.e., a matter of public concern, when a public employee brings a First Amendment Retaliation claim against his or her employer. *Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir.1997). Determining "[w]hether an employee's speech is a matter of public concern involves an examination of the content, form, and context of a given statement, as revealed by the whole record." *Rankin v. McPherson*, 483 U.S. 378, 385 (1987) (quoting *Connick v. Myers*, 461 U.S. 138, 147-148 (1983)). "When a public employee speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences." *Garcetti v. Ceballos*, 126 S.Ct. 1951, 1961 (2006). The U.S. Supreme Court has employed various characterizations to depict what is meant by matters of "public concern." *See Garrison v. Louisiana,* 379 U.S. 64, 74-75(1964) (matters concerned with "the essence of self-government") *with Pickering v. Board of Ed. of Twp. High School Dist.,* 391 U.S. 563, 571-72 (matters as to which "free and open debate is vital to informed decision making by the electorate") *and Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 755 (1985) (plurality opinion) (matters as to which " 'debate ... should be uninhibited, robust, and wide open' ") (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964)). Because of the nature of their employment, speech by public employees is deemed to be speech about public concerns when it relates to their employment so long as it is not speech "upon matters of only personal interest." *Czurlanis v. Albanese,* 721 F.2d at 103 (quoting *Connick,* 461 U.S. at 147). The recent case of *Garcetti v. Ceballos* clarified that "when public employees make statements pursuant to their

16

official duties, the employees are not speaking as citizens for First Amendment purposes." *Garcetti*, 126 S.Ct. at 1960.

In the instant case, Plaintiff alleges that during the 2002-2003 school year she became aware of the illegal and criminal conduct of a School District employee. Docket No. 19 at ¶ 30. The School District employee was alleged to have been fraudulently billing the Pennsylvania Department of Public Welfare. *Id.* Plaintiff reported this conduct to her state representative and the representative in turn informed the Pennsylvania Department of Public Welfare and eventually the Plaintiff's employer, the School District. *Id.* at 31-33. Plaintiff argues that this type of reporting of "wrongdoing in the administration of public programs" is a matter of public concern, and therefore clearly protected activity under the First Amendment. Docket No. 13, at 6.

There is little question that the reporting of how effectively or above-board government is being run is a matter of "public concern." *See Swineford v. Snyder County Pennsylvania,* 15 F.3d 1258, 1271 (3d Cir.1994) (allegation of malfeasance by election officials is speech "fall[ing] squarely within the core public speech delineated in *Connick* "); *Pickering*, 391 U.S. at 571-72 (depriving community of teachers' opinions on how school funds should be allotted seriously hinders free and open debate and is inconsistent with intent of First Amendment); *Watters v. City of Philadelphia*, 55 F.3d 886, 892-895 (3d Cir.1995) (finding former police department employee's statements about employee assistance program to be public concern speech, because public had significant interest in learning about problems which might impair effective operation of program). Plaintiff's reporting of fraud against the Pennsylvania Department of Welfare fits squarely into this tradition. Accordingly, this Court finds that Plaintiff has alleged speech that constitutes speech on a matter of public concern.

17

### b. **Pursuant to Official Duties**

Defendants, however, also argue that the reporting of this illegal conduct is not a protected activity under *Garcetti* because reporting fraud was done pursuant to the Plaintiff's official duties. Docket No. 13, at 7. Defendants posit that "[i]f it were not for the fact that she was employed by Intermediate Unit I and thus was exposed to the allegedly illegal information, she would never have had knowledge or opportunity to report this potentially illegal conduct." Docket No. 23, at 6. Unfortunately for the Defendants, an argument similar to their argument was rejected by the Supreme Court in *Garcetti*. In fact, the Supreme Court rejected the notion that employers could insulate themselves from First Amendment retaliation claims by "creating excessively broad job descriptions." *Garcetti*, 126 S. Ct. at 1961.

Even assuming that Defendants could show their teachers were required by their "job descriptions" to report fraudulent and criminal activity, that fact would not mean Plaintiff's communications were pursuant to her official duties and therefore unprotected. The inquiry into whether Plaintiff's actual job duties would require the reporting of fraud is a practical one. *Id.* The inquiry considers the type of duties "an employee actually is expected to perform." *Id* at 1962. Teachers are not law enforcement officers but educators, and their job is not to keep a watchful eye on their fellow teachers and coworkers but rather to provide information and knowledge to students. Accordingly, the Plaintiff's reporting of fraud to her state representative was not a part of her daily or even intermittent job functions, and thus, in this Court's estimation, qualifies as a protected

activity for First Amendment purposes.[7]

## c. **The Petition Clause of the First Amendment**

Alternatively, this Court notes that the expressive activity the Plaintiff engaged in was not

limited to speech. Plaintiff also alleges she has been the victim of retaliation because she filed

multiple grievances with her local union against the Defendants. The Plaintiff argues, therefore, that

even if she could not sufficiently allege that she was speaking as a citizen on a matter of public

concern, her filing of grievances with her union qualifies as protected activity under the petition

clause of the First Amendment. This is true, the Plaintiff claims, even if the grievances in question

address purely private concerns. Based upon precedent in the Third Circuit, this Court agrees.

It is well settled law in the Third Circuit that petitioning the government in the form of a

lawsuit or the filing of a grievance pursuant to a collective bargaining agreement is protected activity

under the petition clause of the First Amendment to the United States Constitution[8]. *San Filippo v.*

*Bongiovani*, 30 F.3d 424, 434-443 (3d Cir. 1994). A plaintiff need only show that his or her lawsuit

or grievance is not a sham or frivolous to make out a prima facie claim for retaliation under the

---

[7] The Court is aware of the recent precedential Third Circuit case of *Foraker v. Chaffinch*, No. 06-4086, 2007 WL 2445561 (3rd Cir. August 30, 2007), which addressed First Amendment speech claims by government employees. *Foraker* is distinguishable from the instant case, in that the *Foraker* plaintiffs, Delaware State Police employees were acting pursuant to their job duties when reporting on unsafe conditions at a Delaware State Police firearms training facility which they were responsible with managing. *Id.* at *9-10. The Third Circuit considered this to be integral to the fulfillment of the plaintiffs' jobs, and therefore unprotected activity as activity that is "pursuant to official duties." *Id.* In the instant case, as stated above, Plaintiff was reporting a violation of the law to her Congressman pertaining to a fellow employee committing allegedly fraudulent acts, and thus it was not speech pertaining to her official duties as a school teacher.

[8] The *Foraker* case also addressed the Petition Clause as it is applicable to First Amendment speech claims by government employees. *Foraker*, No. 06-4086, 2007 WL 2445561, at *5-6. In *Foraker*, which is distinguishable from the instant case, the plaintiffs used an internal mechanism, specifically their chain of command, which the Third Circuit did not regard as activity protected under the Petition Clause. *Id.* at *5-6. However, the Third Circuit still recognizes that the filing of grievances pursuant to a collective bargaining agreement, as Plaintiff filed in the instant matter, qualify as protected activity under the Petition Clause of the First Amendment. *See San Filippo v. Bongiovani*, 30 F.3d 424, 434-443 (3d Cir. 1994)

petition clause. *Id.* Additionally, and substantially different from the requirements for the protection under the speech clause of the First Amendment, the plaintiff's petition need not address matters of public concern to be worthy of protection. *Hill v. Borough of Kutztown*, 455 F.3d 225, 242, n. 24 (3d Cir. 2006) (citing *San Filippo*, 30 F.3d at 434-443; *Brennan v. Norton,* 350 F.3d 399, 417 (3d Cir. 2003)).

Plaintiff alleges that "[i]n direct retaliation for [her] final grievance, the Defendants Conrady and O'Shea decided to further punish Porter" by transferring her to a special education teaching position for which she was not trained or certified. Docket No. 19, at ¶ 42. This Court finds that the Plaintiff has sufficiently alleged that she petitioned the government for redress of her grievances and, thus, has stated a claim for First Amendment retaliation.

Accordingly, Plaintiff's First Amendment retaliation claim survives and the Defendants' 12(b)(6) Supplemental Motion to Dismiss as to this claim is DENIED.

## C. Equal Protection Claim

In their Supplemental Motion to Dismiss, Defendants also argue that Plaintiff's equal protection claim under the Fourteenth Amendment to the United States Constitution fails because she has failed to properly allege "that she was intentionally singled-out from a group of similarly situated individuals." Docket No. 10, at 7. This Court disagrees.

The equal protection clause of the Fourteenth Amendment protects every individual from intentional and arbitrary treatment at the hands of state officials. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). In order to state an equal protection claim, it is not necessary for the plaintiff to be the member of a protected or suspect class, but instead to simply allege he was

20

intentionally treated differently, even as a "class of one," from those persons who are similarly situated and there are no rational reasons for the difference in treatment. *Id.* (citing *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441 (1923); *Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty.*, 488 U.S. 336 (1989).

In the instant case, Plaintiff alleges that Defendants deliberately treated her differently from the other teachers by subjecting her to an involuntary transfer without a rational basis for doing so. Docket No. 19, at ¶ 55-58. Even without application of equitable tolling as to other transfers and actions of which complaint has been made, this Court, for the reasons stated above, finds the Plaintiff's amended complaint sufficiently states a claim for violation of her equal protection rights based on the last transfer, alone.

Accordingly, the Defendant's Supplemental Motion to Dismiss as to this claim is DENIED.

## V. CONCLUSION

Accordingly, this 5th day of September, 2007, upon due consideration of the Parties' Stipulation allowing Plaintiff to file an amended complaint (Docket No. 18), Plaintiff's Amended Complaint (Docket No. 19), Defendants' Supplemental Motion to Dismiss (Docket No. 20), Plaintiff's brief in response (Docket No. 21), Defendants' Notice Advising the Court of Changes to Case Law (Docket No. 23), Plaintiff's Notice Concerning Changes in Case Law (Docket No. 26), and in accordance with the foregoing Opinion, IT IS HEREBY ORDERED that Defendants' Supplemental Motion to Dismiss will be GRANTED in part and DENIED in part as follows:

1.) Defendant's Supplemental Motion to Dismiss is granted with respect to all alleged civil

21

rights claims under 42 U.S.C. § 1983 that occurred prior to the Plaintiff's last transfer to the AEC on August 28, 2004;

2.)   Defendant's Supplemental Motion to Dismiss is denied with respect to all alleged civil rights claims under 42 U.S.C. § 1983 arising out of, or after, the transfer to the AEC on August 28, 2004;

3.)   Defendant's Supplemental Motion to Dismiss is denied with respect to Plaintiff's First Amendment retaliation claim; and

4.)   Defendant's Supplemental Motion to Dismiss is denied with respect to Plaintiff's equal protection claim under the Fourteenth Amendment to the United States Constitution.

An appropriate order follows.

//s//Nora Barry Fischer
Nora Barry Fischer
United States District Judge

cc:  All counsel of record
Date: September 5, 2007

22